UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

STACEY PYNN,

      Plaintiff,

    v.

MATTHEW PYNN et al.,

      Defendants.

---

24-CV-508-LJV
DECISION & ORDER

In 2024, the pro se plaintiff, Stacey Pynn, filed a complaint asserting claims under 42 U.S.C. § 1983, as well as under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and other federal and state laws.  Docket Item 1.  She moved to proceed in forma pauperis ("IFP"), Docket Item 2, and this Court granted that motion, Docket Item 9.  She also moved for a preliminary injunction and a temporary restraining order ("TRO"), Docket Item 4; for electronic filing privileges, Docket Item 5; for service by the United States Marshals Service, Docket Item 6; and for this Court to rule on her pending motions, Docket Item 8.  This Court denied those motions.  Docket Item 9.  Pynn then sought reconsideration of the order denying her motion for a preliminary injunction and TRO, Docket Item 10, which the Court also denied, Docket Item 14.

On October 24, 2025, Pynn filed a sealed motion to amend the complaint and included a proposed amended complaint.[1]  Docket Items 24-25.  A few months later, she again moved for a preliminary injunction.  Docket Items 29-31.

The Court now screens the complaint under 28 U.S.C. § 1915(e)(2) and decides Pynn's motions to amend and for a preliminary injunction.  For the reasons that follow, Pynn's claim for "violation of due process right to care and custody of children" may proceed against Niagara County and John Spero in his individual capacity.  But her claims against Andrew Isenberg, Dean Puleo, the New York State Unified Court System, the New York State Office of Court Administration, all judges, the Niagara County Clerk's Office, the Niagara County Department of Social Services, and Niagara County Child Protective Services are dismissed under 28 U.S.C. § 1915(e)(2)(B).  Pynn's remaining claims against the other defendants will be dismissed under that same section unless she files an amended complaint that corrects the deficiencies noted below.  The Court denies Pynn's motion to amend the complaint, Docket Item 24, to add the defendants identified in her proposed amended complaint, Docket Item 25.  The Court also denies her motion for a preliminary injunction, Docket Item 29, along with her requests for declaratory and other injunctive relief, Docket Item 1 at 97-99.

---

[1]  An amended complaint is intended to **completely replace** the prior complaint and thus "renders [any prior complaint] of no legal effect."  *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977).  Pynn's proposed amended complaint, however, does not attempt to replace the original and instead pleads facts only against five new defendants and seeks to "incorporate[]" the original complaint.  *See* Docket Item 25 ¶ 12.  In light of Pynn's pro se status, the Court will screen the original complaint, Docket Item 1, and then address the motion to amend, Docket Items 24-25.

**DISCUSSION**

Section 1915(e)(2) "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)).  The court shall dismiss a complaint in a civil action "at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." *See* 28 U.S.C. § 1915(e)(2).

Generally, the court will afford a pro se plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas*, 480 F.3d at 639 (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("A pro se complaint is to be read liberally.  Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." (italics omitted) (quoting *Gomez*, 171 F.3d at 795)).  But leave to amend pleadings may be denied when any amendment would be "futile." *Cuoco*, 222 F.3d at 112.

**I.     SCREENING THE COMPLAINT**

In evaluating the complaint, the court accepts all factual allegations as true and draws all inferences in the plaintiff's favor.  *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003) (per curiam); *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999).  Although "a court is obliged to construe [pro se] pleadings liberally, particularly when they allege civil

3

rights violations," *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004), even a pro se complaint "must plead 'enough facts to state a claim to relief that is plausible on its face,'" *Shibeshi v. City of New York*, 475 F. App'x 807, 808 (2d Cir. 2012) (summary order) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim will have 'facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In other words, although a pro se complaint need not provide every last detail in support of a claim, it must allege some facts that support the claim.  *See id.* (concluding that district court properly dismissed pro se complaint under section 1915(e)(2) because complaint did not meet pleading standard in *Twombly* and *Iqbal*).  And even pro se pleadings must meet the requirements of Rule 8 of the Federal Rules of Civil Procedure, *see Wynder v. McMahon*, 360 F.3d 73, 79 n.11 (2d Cir. 2004), and "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (alteration in original) (quoting *Twombly*, 550 U.S. at 555).

Pynn has sued more than 30 defendants—including her ex-husband, Matthew Pynn; the New York State Unified Court System and Office of Court Administration; a number of New York State judges and justices; and Niagara County and a number of its departments and employees—for violating her rights under the New York State and United States Constitutions, RICO, and several criminal statutes.  Docket Item 1.  A liberal reading of the complaint tells the following story.[2]

---

[2] The following facts are taken from the complaint, Docket Item 1, including the state court records that Pynn attached to it.  *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (a complaint is "deemed to include any written

4

In 2002, Pynn married Matthew Pynn,[3] an attorney employed by Niagara County in various capacities for more than two decades. *Id.* ¶¶ 69-71. The couple had four children together. *Id.* ¶ 71. In 2013, Stacey Pynn "filed for divorce" in New York State Supreme Court, Niagara County. *Id.*

"Due to the nature of his job as a Niagara County [p]ublic [d]efender," Matthew Pynn became "well acquainted with judges, court officials and court staffers" as well as "with local police and other investigative officers, especially child welfare investigators" in Niagara County. *Id.* ¶ 70. Through those contacts, he was able to "use[] . . . the [c]ourt system" to cover up his own criminal activities. *Id.* ¶¶ 34-37, 70. Indeed, the "courts and child welfare agencies located in and around Niagara County . . . conspired to criminally cover up the severe child abuse and maltreatment committed by" Matthew Pynn. *Id.* ¶ 72.

Since 2013, a number of New York State Supreme Court Justices named as defendants have been assigned to the Pynns' divorce case: Justice Catherine Nugent Panepinto, Justice Richard Kloch, Justice Sara Sheldon, Justice Daniel J. Furlong, and Justice Frank Sedita III. *See id.* ¶¶ 122-125, 129-132, 148-200. Pynn says that each of those jurists was biased against her and part of a conspiracy to cover up Matthew Pynn's misconduct. *See id.* More specifically, the justices issued orders favoring

---

instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." (citation and internal quotation marks omitted)).

[3] Stacey Pynn is referred to as "Pynn," or occasionally, for clarity's sake, as "Stacey Pynn." Matthew Pynn is referred to throughout this decision by his full name.

Matthew Pynn, then recused themselves after Stacey Pynn brought to light each justice's conflict of interest.  *See id.*

The only exception is Justice Sedita, and not in a good way.  "[D]espite his obvious bias," Justice Sedita has "refuse[d] to disqualify himself" from the case, even after Pynn filed several motions for his recusal.  *Id.* ¶ 189; *see also id.* ¶¶ 190-200 (detailing Justice Sedita's various unfair rulings and refusal to recuse himself).  Most notably, on December 3, 2021, Justice Sedita issued an order "preclud[ing Pynn] from filing any applications in the court without prior approval or an attorney."  *Id.* ¶ 193.

Pynn has appealed at least some of the orders issued in the matrimonial proceedings—including Justice Sedita's order barring her from filing unapproved applications pro se—to the New York State Supreme Court, Appellate Division, Fourth Department.  *See id.* ¶¶ 169, 193, 195; *see also id.* at 101-120[4] (state court docket attached as an exhibit showing notices of appeal filed by Pynn).  The Fourth Department ruled in Pynn's favor on her appeal of an order issued by Justice Furlong and against her on her appeal of the filing injunction.  *See id.* ¶¶ 169, 193, 195.  But according to Pynn, at least one justice created "false 'orders' with an incorrect case index" to ensure those orders "cannot be appealed."  *See id.* ¶¶ 178, 264(c).

Pynn also filed motions to change venue, but those motions were "consistently denied" by another defendant, Judge Kevin M. Carter, formerly the administrative judge for New York State's Eighth Judicial District.  *Id.* ¶ 123.  Judge Carter also ignored Pynn's emails about missing evidence in the state court record.  *Id.* ¶¶ 215-20.

---

[4] Page numbers in docket citations refer to ECF pagination.

Along the same lines, when Pynn complained to two defendants—Judge Norman St. George, the first deputy chief administrative judge of the New York Court System, and Judge Lawrence Marks, the former chief administrative judge of the New York Court System—about the actions of the other jurists involved in her legal proceedings, Judge St. George and Judge Marks failed to "effective[ly] interven[e]." *Id.* ¶¶ 47-48, 266(h).  Moreover, the New York State Unified Court System and its "administrative arm," the New York State Office of Court Administration—both defendants here—have "refused to right the[se] wrong[s]," thus "obstruct[ing] justice." *Id.* ¶¶ 42-43, 255, 262.

Due to the bias of the New York State Supreme Court, Niagara County, Pynn has filed several actions in other courts "[i]n an[] attempt to obtain a fair forum." *See, e.g., id.* ¶ 211.  In July 2016, for example, Pynn filed a case in this Court against several of the same defendants named here, including Matthew Pynn, Niagara County, Niagara County Child Protective Services ("Niagara County CPS"), Niagara County CPS Supervisor Bianca Gatto, and the Niagara County Department of Social Services ("Niagara County DSS").  *Id.* ¶ 226; *see Pynn v. Pynn*, Case No. 16-cv-548, Docket Item 1 (W.D.N.Y. July 5, 2016).  Pynn alleged that the defendants in that case were "conspir[ing]" with various others, including a New York State Supreme Court justice, to "protect" Matthew Pynn and "deprive [Stacey Pynn] of custody of and access to her four minor children." *Pynn*, Case No. 16-cv-548, Docket Item 6 ¶ 2 (W.D.N.Y. Aug. 9, 2016) (amended complaint).  This Court dismissed that case for lack of subject matter jurisdiction. *Id.*, Docket Item 108 (W.D.N.Y. Feb. 7, 2019).

Several years later, in September 2022, Pynn applied in Niagara County Family Court for a "[t]emporary [o]rder of [p]rotection for her[self] and her children" against

Matthew Pynn.  Docket Item 1 ¶ 201.  After "[a]ll [Niagara County] Family Court [j]udges . . . recused" themselves due to their "familiarity" with Matthew Pynn, defendant Judge Keith D. Kibler, a family court judge from Wyoming County, was assigned to the matter. *Id.* ¶¶ 202-03.  Judge Kibler denied Pynn's application without affording her adequate due process and subsequently "refused to [recuse] himself" from the case "despite his obvious obligations to do so."  *Id.* ¶ 207.

Pynn then sought an "[e]mergency [t]emporary [o]rder of [p]rotection for her[self] and her children against . . . Matthew Pynn" in Erie County Family Court.  *Id.* ¶ 211. That case was "dismissed . . . and remanded" to a court in Niagara County despite that court's "conflict[s ]of[ ]interest."  *Id.*  In January 2023, Pynn "commenced her own civilian criminal complaint[ against] Matthew Pynn" in Lockport City Court.  *Id.* ¶ 224.  But Judge Carter and two of his "assistants"—defendants Andrew Isenberg and Dean Puleo— "shielded the complaint from proceeding" as part of what Pynn calls the conspiracy to aid in and "cover[ ]up" Matthew Pynn's "child endangerment."  *Id.* ¶¶ 50-51, 224-25.

Others involved in Pynn's legal proceedings or the underlying custody dispute also have been biased or corrupt.  For instance, the Niagara County Clerk's Office, Niagara County Clerk Joseph Jastrzemski, and Clerk's Office employee Lisa Kessler— all named as defendants here—did not ensure that the record in Pynn's divorce proceedings was entirely correct and complete.  *See id.* ¶¶ 46, 57-58, 120-21, 177.  In addition, defendants Niagara County CPS and DSS, and several of those entities'

employees and representatives, failed to properly investigate Matthew Pynn and charge him with child abuse.[5]  *Id.* ¶¶ 56, 59-63, 226-245.

Likewise, defendant David Nathanson, a "purported forensic psychologist" appointed by Justice Kloch in the state court proceedings, "conspired to conceal the . . . sexual abuse" committed by Matthew Pynn by writing an incorrect and biased report. *See id.* ¶¶ 65, 139-145.  Defendant Charles P. Ben, an attorney, similarly accepted an appointment to represent the Pynn children despite his prior working relationship with Matthew Pynn.  *See id.* ¶¶ 165, 207, 269(d).  Finally, three officers with the New York State Police—defendants Ronald Wilson, John Spero, and Stanley Edwards III—failed to "properly investigate" Matthew Pynn's sexual abuse.  *Id.* ¶¶ 145-47.  In fact, Spero made "willful false statements that he did an investigation and [that] there was no indication that [Matthew] Pynn ever acted in a manner that would be considered harmful to the welfare of his child."  *Id.* ¶ 146 (internal quotation marks omitted).

Pynn says that the dozens of defendants conspired to "conduct[] a criminal enterprise involving the exploitation and abuse of minors"—including her four children—and to "cover up[]" that "criminal activity."  *Id.* ¶¶ 17-20.  She also says that the defendants, individually and together, violated her constitutional rights to due process, equal protection of law, and access to the courts.  *See id.* at 74-79, 81-85.  She seeks

---

[5] More specifically, Pynn names the following individuals as defendants who failed to adequately investigate and charge Matthew Pynn: CPS supervisor Bianca Gatto; former DSS and CPS attorney Nicholas D'Angelo; DSS attorney David Haylett, Jr.; CPS caseworker Rhonda Platt; Niagara County Attorney Claude Joerg; DSS Commissioner Meghan Lutz; and "Jane Doe," a CPS supervisor.  *See* Docket Item 1 ¶¶ 56, 58-63, 226-245; *id.* at 1, 63.

compensatory and punitive damages, *id.* at 97, along with various forms of injunctive and declaratory relief, *id.* at 97-99.[6]

## II.    IMMUNITY

### A.    Eleventh Amendment Immunity

Pynn claims that the New York State Unified Court System, the New York State Office of Court Administration, and the Niagara County Clerk's Office violated her First, Fifth, Ninth, and Fourteenth Amendment rights; failed to "prevent fraud, abuse, and conflict[s] of interest" in violation of 42 U.S.C. § 602(6); "violate[d] New York State's contract with the [f]ederal [g]overnment to receive Title IV Federal Funding under the Child Abuse Prevention and Treatment Act"; violated the False Claims Act; engaged in "criminal activity [under] the [RICO] Act"; and committed other crimes.  *See* Docket Item 1 ¶¶ 73, 124, 195, 223, 257-64.  The New York State Unified Court System, the Office of Court Administration, and the Niagara County Clerk's Office are arms of New York State.  *See* N.Y. Const. art. VI, § 1(a); *Gollomp v. Spitzer*, 568 F.3d 355, 367-68 (2d Cir. 2009) (holding that the New York State Unified Court System is an "arm of the [s]tate" (quoting *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006))); *McKeown v. N.Y. State Comm'n on Jud. Conduct*, 377 F. App'x 121, 122-

---

[6] More specifically, she asks this Court to transfer any matters involving "Pynn and her immediate family" to a different forum outside Niagara County; "declar[e] that the actions of all the [d]efendants . . . corruptly violated [Pynn]'s" rights; "rule" that the judicial defendants' "orders . . . are void and unenforceable"; "remov[e] all state court orders that preclude" her "right of public access to the courts"; "order [d]efendants to cease and desist from obstructing official government records"; "enter" the New York State Unified Court System "into a federal receivership"; deny any immunity to any defendants "without their required oath on file"; and declare "that the New York CPS Program Manual" is unconstitutional.  Docket Item 1 at 97-99.

23 (2d Cir 2010) (summary order) (holding that the New York State Office of Court Administration is an "arm[] of the [s]tate"); *Gamble v. Off. of the Cnty. Clerk in Bronx Cnty.*, 2025 WL 41999, at *2 (S.D.N.Y. Jan. 2, 2025) (holding that county clerk's office is an "arm of the state.")

"The Eleventh Amendment bars damage[ ] actions in federal court against a state[,] and against state officials acting in their official capacities, unless the state waives sovereign immunity or Congress abrogates it." *Chris H. v. New York*, 740 F. App'x 740, 741 (2d Cir. 2018) (summary order). "New York has not waived its immunity for damages claims brought under [section] 1983, nor has Congress abrogated it." *Thomas v. Martin-Gibbons*, 857 F. App'x 36, 37 (2d Cir. 2021) (summary order) (first citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977); and then citing *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990)). So the Eleventh Amendment bars official capacity suits under section 1983 and RICO for money damages against New York State. *See id.; see also Kentucky v. Graham*, 473 U.S. 159, 169 (1985) ("[A]bsent waiver by the [s]tate or valid congressional override, the Eleventh Amendment bars a damages action against a [s]tate in federal court . . . This bar remains in effect when [s]tate officials are sued for damages in their official capacity." (citations omitted)); *Moore v. City of New York*, 2011 WL 795103, at *7 n.3 (E.D.N.Y. Feb. 28, 2011) ("Congress did not abrogate Eleventh Amendment protection when it passed the RICO statute . . . and New York State has not waived its sovereign immunity either from RICO claims." (citation omitted)). And as arms of the state, the New York State Unified Court System, the Office of Court Administration, and the Niagara County Clerk's Office are protected by that immunity. *See Arce v. Turnbull*,

11

2019 WL 4451477, at *4 (W.D.N.Y. Sept. 17, 2019) (because "[t]he New York State Unified Court System . . . is 'unquestionably an arm of the [s]tate, [New York courts are] entitled to Eleventh Amendment sovereign immunity'" (quoting *Gollomp*, 568 F.3d at 368)); *McKeown*, 377 F. App'x at 122-23 (holding that lawsuits against the New York State Office of Court Administration are barred the Eleventh Amendment); *Gamble*, 2025 WL 41999, at *2 ("[C]laims against the Bronx County Clerk's Office are barred by the Eleventh Amendment because the office is an arm of the state.").

Pynn's claims for damages against the state entities are therefore barred.  But Pynn does not simply seek damages in connection with the Niagara County proceedings; she also asks for declaratory relief.  *See* Docket Item 1 at 97.  More specifically, she asks "that this Court . . . declar[e]" that her rights to equal protection, due process, and access to the courts were violated "since inception of" her state court proceedings.  *Id.*  That relief is precluded by Eleventh Amendment immunity as well.

Although the Eleventh Amendment "does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law," *Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir. 2000) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)), "'[a] declaratory judgment is not available when the result would be a partial end run around' the Eleventh Amendment's bar on retrospective awards of monetary relief," *id.* at 120 (quoting *Green*, 474 U.S. at 73).  "The line between prospective and retrospective relief is drawn because '[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law,' whereas 'compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.'"  *Id.* at 119 (citing

*Green*, 474 U.S. at 68). So while a court may enjoin future action by state officials and grant declaratory relief consistent with such an injunction, the Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law *in the past*." *Gibson v. Cuomo*, 2022 WL 22870127, at *3 (W.D.N.Y. Mar. 25, 2022) (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). Pynn's request for a declaration that her constitutional rights were "corruptly violated" in connection with her various court proceedings, Docket Item 1 at 97-99, is therefore barred.

The same is true of Pynn's request that this Court declare "the New York CPS Program Manual" unconstitutional. *See id.* at 98. At first glance, that request might be construed as seeking an injunction against the manual's requirement that the relevant social services department refer a case "back to the district in which the subject resides" following a "finding of child abuse/maltreatment," *id.* ¶ 238—that is, as seeking prospective injunctive relief. But Pynn refers to that policy only in the context of *her own cases* having been referred back to Niagara County. *See id.* ¶¶ 211, 238-39. That is to say, Pynn's issue is with how the manual affected her case, not its prospective effect. And those past incidents, "in conjunction with [Pynn's] conclusory language requesting injunctive relief," are "insufficient" to escape to escape the Eleventh Amendment's bar. *See Kelsey v. Kessel*, 2024 WL 1020522, at *4 (S.D.N.Y. Mar. 8, 2024) (Eleventh Amendment barred claim seeking "nullification" of order of protection and "invalidation" of state law on which it was based where plaintiff complained only of past harm suffered due to order of protection).

13

In sum, because the New York Unified Court System, the Office of Court Administration, and the Niagara County Clerk's Office are protected by sovereign immunity, Pynn cannot recover damages against them.  Likewise, sovereign immunity bars her requests for declaratory relief as well.  And because better pleading would not cure those defects, Pynn's claims against the New York State Unified Court System, the New York State Office of Court Administration, and the Niagara County Clerk's Office, along with her parallel requests for declaratory relief, are dismissed without leave to amend.

### B.    Judicial and Quasi-judicial Immunity

Pynn names nine New York State justices and judges—Justice Nugent Panepinto, Justice Furlong, Justice Sedita, Justice Kloch, Justice Sheldon, Judge Carter, Judge Marks, Judge St. George, and Judge Kibler (collectively, the "judicial defendants")—who in various ways were involved in her divorce proceedings against Matthew Pynn.  She alleges that these jurists acted corruptly and conspired to violate her First, Fifth, Ninth, and Fourteenth Amendment rights; "abused process[]" in violation of New York law by failing to recuse themselves and by issuing unfavorable orders; endorsed criminal acts in "violat[ion of] New York [S]tate's Title IV Federal Funding income requirements"; engaged in "criminal activity [under] the [RICO] Act"; and violated several other federal and New York criminal laws.[7]   Docket Item 1 ¶¶ 75, 122-25, 262-66, 269-70.

---

[7] Pynn also alleges that several jurists "failed or neglected to take and file their . . . public officer's oath" required under New York State Public Officer's Law § 10, and that many of the orders issued against her therefore are "void."  *See* Docket Item 1 ¶¶ 78-81, 84, 91, 99.  Pynn's allegations that the jurists failed to take or "file" their oaths are conclusory.  But even if they were well pleaded, and even accepting these allegations as true, "[i]t is well settled . . . that the failure of [an] officer to take the

"It is well settled that judges generally have absolute immunity from suits for money damages for their judicial actions." *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009); *see also Kellogg v. Nichols*, 703 F. Supp. 3d 367, 372 (N.D.N.Y. 2023) ("The doctrine of judicial immunity shields judges from suit to the extent they are sued in their individual capacities."). This is to ensure "that a judicial officer, in exercising the authority vested in [that judge], shall be free to act upon [the judge's] own convictions, without apprehension of personal consequences." *Bradley v. Fisher*, 80 U.S. 335, 347 (1871). Judicial immunity therefore does not give way even to "allegations of bad faith or malice." *Mireles v. Waco*, 502 U.S. 9, 11 (1991).

Judicial "immunity is overcome in only two sets of circumstances." *Id.* "First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity." *Id.* (citations and italics omitted). "Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.* at 12 (citations omitted).

Pynn's claims concern the justices' and judges' alleged conduct and decisions while presiding over her divorce proceedings. She says that they "maintained cases and failed their lawful obligations to disclose their conflicts with . . . Matthew Pynn and recuse," thereby denying her right to access the courts and to "a fair and impartial

---

prescribed oath of office will not prevent him from discharging his duties." *Matter of Delehanty*, 202 Misc. 33, 36, 115 N.Y.S.2d 602, 606 (Sup. Ct. N.Y. Cnty. 1952), *aff'd*, 280 A.D. 542, 115 N.Y.S.2d 614 (1st Dep't 1952) (citing *Sylvia Lake Co. v. Northern Ore Co.*, 242 N.Y. 144, 147 (1926) ("[S]o far as the public and third persons are concerned, the official acts of a de facto judge are just as valid as those of a de jure judge.")).

forum." Docket Item 1 ¶ 118. But such allegations fall squarely in the protection

afforded by judicial immunity.[8]

"The Supreme Court has generally concluded that acts arising out of, or related

to, individual cases before the judge are considered judicial in nature." *Bliven*, 579 F.3d

at 210. Further, courts have held that judges' decisions on motions—even motions to

recuse—are indisputably judicial in nature. *See Buhannic v. Friedman*, 2019 WL

481732, at *5 (S.D.N.Y. Feb. 7, 2019) (ruling on motions is a "quintessential judicial

act[]"); *Moskovits v. Bank of Am. N.A.*, 2021 WL 230193, at *4 (S.D.N.Y. Jan. 20, 2021)

("[A] judge's decision to recuse or not to recuse himself is itself a judicial act protected

---

[8] Pynn does not allege that Judges St. George and Marks—the first deputy chief administrative judge of the New York Court System and the former chief administrative judge of the New York Court System, respectively—presided over her divorce proceedings; instead she alleges that they failed to "effective[ly] interven[e]" when she complained to them about the actions taken by the other judges. *Id.* ¶¶ 47-48, 266(h).

It is certainly true that judicial immunity does not extend to non-judicial acts. *See Bliven*, 579 F.3d at 209. For that reason, the Supreme Court has concluded that a judge was not entitled to judicial immunity in connection with terminating the employment of a probation office employee. *See Forrester v. White*, 484 U.S. 219, 228-30 (1988). When terminating an employee, a judge acts as an administrator, not as a judge. *See id.* at 229.

But Pynn does not take issue with administrative actions taken by Judges St. George and Marks. Rather, she alleges, they failed to sufficiently investigate her complaints against the other judges and properly respond. *See* Docket Item ¶¶ 47-48, 266(h). And those actions—"responding to disciplinary complaints and assigning proceeding among judges"— are ultimately judicial in nature. *See Jackson v. Stanford*, 2019 WL 13166075, at *2 (S.D.N.Y. Jan. 7, 2019) (dismissing claims against Judge Marks on basis of judicial immunity where plaintiff alleged "that Marks failed to investigate [plaintiff]'s complaint against [New York State Supreme Court judge] and refused to transfer [plaintiff's] proceeding to another" judge). Pynn's claims against Judges St. George and Marks therefore fare no better than her claims against the other judges named in the complaint. And the same is true to the extent her claims against Judge Carter, formerly the administrative judge for New York State's Eighth Judicial District, involve his refusal to move the venue for her proceedings or investigate the complaints raised in her emails.

by immunity." (citing *Bobrowsky v. Yonkers Courthouse*, 777 F. Supp. 2d 692, 714 (S.D.N.Y. 2011))).  Pynn complains about what the judges did or did not do when they presided over her case—precisely the acts and decisions for which judges are immune from suit.

Pynn's allegations that the judges "conspired" with Matthew Pynn and other county employees, Docket Item 1 ¶¶ 103, 118-19, does not change this analysis.  More specifically, she asserts that the judges collectively "conspired to commit and cover[] up" child abuse by issuing orders against her "[d]espite the plethora of evidence that [her] children were sexually abused, strangulated [sic], and harshly neglected."  *Id.* ¶ 103, 119.  But right or wrong, the judges' orders and decisions are clearly "judicial" actions protected by absolute judicial immunity.  *Bobrowsky*, 777 F. Supp. 2d at 715 (holding that judge's "rulings[, even though] adverse to plaintiff, [we]re the very essence of 'judicial functions' and [could ]not, therefore, be the basis for liability" (citation omitted)).  And even "[m]ore fundamentally, since absolute immunity spares [judges] any scrutiny of [their] motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity."  *See Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987).

Pynn's claims against the justices and judges therefore are subject to dismissal because of judicial immunity.[9]  And because "better pleading w[ould] not cure" that defect, those claims are dismissed without leave to amend.  *Cuoco*, 222 F.3d at 112.

---

[9] As noted below, to the extent Pynn intended to sue the nine judicial defendants, along with Isenberg and Puleo, in their official capacities, any such claims are barred by the Eleventh Amendment.

For the same reasons, Pynn's claims against defendants Isenberg and Puleo are dismissed.  Pynn alleges that Isenberg and Puleo, Judge Carter's "assistants", "shielded [Pynn's criminal] complaint" against Matthew Pynn "from proceeding" to a criminal action, "thereby conspiring . . . to commit and cover[ ]up strangulation and other forms of child endangerment."  Docket Item 1 ¶¶ 50-51, 225.  But "judges and their supporting staff are afforded absolute immunity" for judicial tasks.  *Dekom v. Fannie Mae*, 846 F. App'x 14, 19 (2d Cir. 2021) (summary order) (quoting *Rodriguez v. Weprin*, 116 F.3d 62, 66-67 (2d Cir. 1997)).  Therefore, for the same reasons that the judges and justices are entitled to immunity for issuing unfavorable orders and for the alleged conspiracy, Isenberg and Puleo are entitled to immunity as well.  *See Rodriguez*, 116 F.3d. at 66-67.  And because "better pleading w[ould] not cure" this defect, the claims against Isenberg and Puleo are dismissed without leave to amend.  *Cuoco*, 222 F.3d at 112.

## III.    NIAGARA COUNTY AGENCIES

Pynn names Niagara County and two of its agencies—Niagara County DSS and Niagara County CPS—as defendants.  *See generally* Docket Item 1.  But those agencies cannot be sued because only a county itself—not an administrative arm of the county—is a viable defendant.  *See S.W. v. Warren*, 528 F. Supp. 2d 282, 302 (S.D.N.Y. 2007) ("Under New York law, departments which are merely administrative arms of a municipality have no separate legal identity apart from the municipality and therefore cannot sue or be sued."); *Bell v. Cayuga Cnty. Dep't of Soc. Servs.*, 2018 WL 2100602, at *2 (W.D.N.Y. May 7, 2018) (dismissing claims against Cayuga County Department of Social Services because it is an "administrative arm" of the county).  Therefore, Pynn's claims against Niagara County DSS and Niagara County CPS are

18

dismissed, and because "better pleading w[ould] not cure" the defect, they are dismissed without leave to amend. *Cuoco*, 222 F.3d at 112.[10]

## IV.   SUBSTANTIVE CLAIMS

### A.   Section 1983

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

A municipality cannot be held liable under section 1983 unless the challenged action was undertaken pursuant to a municipal policy or custom. *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 694 (1978). To state a claim under *Monell*, a plaintiff must plead three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

---

[10] Although a Court may "redirect" a claim brought against an administrative arm of a municipality against the municipality itself, *see Nowlin v. 2 Jane Doe Female Rochester New York Police Officers*, 2012 WL 1415704, at *2 (W.D.N.Y. Mar. 23, 2012) (redirecting claims against Monroe County Jail "as against defendant Monroe County"), Pynn already has named Niagara County itself as a defendant, Docket Item 1 at 1, so such action is not necessary.

19

When asserting claims against individual defendants,[11] "[a] prerequisite to a claim for damages under [s]ection 1983 . . . is a defendant's 'personal involvement' in the alleged constitutional violation."  *Carwell v. City of New York*, 2023 WL 419182, at *5 (S.D.N.Y. Jan. 26, 2023) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001)).  To show such involvement, "the plaintiff must directly plead and prove

---

[11] With regard to the numerous individual defendants who are employed by governmental entities, Pynn does not specify whether she is suing those defendants for damages in their official or individual capacities.  To the extent that she intends to sue them in their official capacities, a section 1983 claim against an individual in his or her official capacity "is in effect a claim against the governmental entity itself."  *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012) (citing *Monell*, 436 U.S. at 691 n.55).  It is thus "well settled that 'a suit against a municipal officer in his or her official capacity is functionally equivalent to a suit against the entity of which the officer is an agent.'"  *Rech v. Siragusa*, 2023 WL 2559409, at *7 (W.D.N.Y. Mar. 3, 2023) (quoting *Baines v. Masiello*, 288 F. Supp. 2d 376, 384 (W.D.N.Y. 2003)); *see also Beckwith v. Erie Cnty. Water Auth.*, 413 F. Supp. 2d 214, 224-25 (W.D.N.Y. 2005) ("A claim against a government official in his official capacity is merely another way of asserting a claim against the governmental entity that employs the official." (citing *Monell*, 436 U.S. at 690 n. 55)).  Therefore, to the extent Pynn intended to sue the Niagara County employees she names as defendants—D'Angelo, Lutz, Gatto, and Platt—for damages in their official capacities, any such claims would be redundant of her claims against Niagara County.

Any potential official capacity claims against the various individual defendants employed by New York State would fare no better.  As noted above, the Eleventh Amendment bars official capacity suits for money damages against New York State and state officials acting in their official capacities.  Therefore, any official capacity claims against the state employees Pynn names—the nine judges and justices, three state police officers, and two court employees—also would be barred.  *See Daniel v. Safir*, 135 F. Supp. 2d 367, 372 (E.D.N.Y. 2001) (Eleventh Amendment barred official capacity claims against law clerks employed by New York state court judges); *Johnston v. Bauer*, 2023 WL 9534631, at *2 (N.D.N.Y. Oct. 12, 2023), *report and recommendation adopted*, 2024 WL 456786 (N.D.N.Y. Feb. 6, 2024)  ("[J]udges within the New York State Unified Court System are entitled to Eleventh Amendment immunity to the extent they are sued in their official capacity."); *Keir v. Donaldson*, 2025 WL 3442904, at *11-12 (N.D.N.Y. Dec. 1, 2025) (dismissing official capacity claims against New York State Police officer because of "Eleventh Amendment immunity").

20

that 'each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 612 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). "A defendant in a [section] 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (alteration and internal quotation marks omitted).

### 1.    Access to the Courts

"It is well established that all persons enjoy a constitutional right of access to the courts, although the source of this right has been variously located in the First Amendment right to petition for redress[;] the Privileges and Immunities Clause of Article IV, section 2[;] and the Due Process Clauses of the Fifth and Fourteenth Amendments." *Monsky v. Moraghan*, 127 F.3d 243, 246 (2d Cir. 1997) (citations omitted). Pynn raises two causes of action concerning the alleged denial of her right to access the courts. The first, for "case-fixing" in violation of the "Fifth and Fourteenth Amendment right[] of due process and equal protection," states that the defendants "conspired to obstruct justice" and engaged in "'case-fixing' . . . to influence and impede adjudication" of her state court cases. Docket Item 1 ¶ 262. Along the same lines, the complaint's third cause of action is labeled "conspiracy . . . to deprive plaintiff of her [First] Amendment public right of access to the courts" and alleges that the defendants "intended to obstruct her right of access to the courts in a manner to influence [or] impede adjudication" and "corrupted the official court record" to further this objective. *Id.* ¶ 264. Because both causes of action allege denial of fair access to the courts and arise from the same conduct, the Court will consider them together.

"To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury [as a result of being denied access to the courts]." *Oliver v. City of New York*, 2022 WL 633873, at *2 (S.D.N.Y. Mar. 4, 2022) (citation and emphasis omitted). As such, "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

Pynn submits a long list of conclusory allegations about how the defendants collectively denied her access to the courts. For example, she says that "some . . . impersonated positions as public officers," while "others presided on cases despite financial and political conflicts of interest." Docket Item 1 ¶ 262. She says that the defendants "repeatedly and persistently violated state and criminal laws and massively obstructed documents from official court[ or] government records." *Id.* She says that the defendants "persistently promulgated deliberate[,] malicious[,] manufactured[, or] known to be manufactured false narratives and created false probable cause"; attempted to silence her when Justice Furlong told her "[s]hut your mouth!"; and "[f]inancially battered and . . . exploited [her] for millions of dollars." *Id.* And she says that the defendants engaged in witness tampering, suppressed evidence, filed "false" court orders, and "corrupted the official court record." *Id.* ¶¶ 262, 264.

But Pynn does not plead any facts supporting her conclusory assertions. Indeed, most of her allegations do not even say which defendant did what. For example, Pynn does not say who engaged in witness tampering and who created "false probable

22

cause," nor does she say anything about how anyone did either of those things. Likewise, Pynn does not say who "[f]inancially battered and . . . exploited" her or how they did that. Without more, the Court cannot discern which defendants denied Pynn access to the courts.

Pynn's claims that the defendants denied her access to courts therefore are subject to dismissal. In light of Pynn's pro se status, however, *see Cuoco*, 222 F.3d at 112, she may amend her complaint to add facts alleging that specific defendants denied her access to the courts and how they did that. In other words, any amended complaint must name each individual defendant who denied Pynn access to the courts and explain how. And with respect to any claim against Niagara County, Pynn also must detail the municipal custom, policy, or practice that she believes denied her access to the courts.

### 2. Defamation

Pynn says that the defendants also "conspired" to "defame" her in violation of section 1983. Docket Item 1 ¶ 263. She claims that the defendants "shared among themselves . . . that [Pynn] is a 'contemptuous[,]' 'meritless[,]' 'frivolous' litigator while they knew she was not" and "falsely label[led]" her as "contumacious" and a "false alleger." *Id.* She adds that as a result of these statements, "people at work . . . talk[ed] about her" and assumed "she must have done something wrong." *Id.*

As an initial matter, "[i]t is well established that pure opinions, no matter how offensive, cannot be the subject of an action for defamation." *Coleman v. Grand*, 158 F.4th 132, 139 (2d Cir. 2025) (internal quotation marks omitted). The statements made about Pynn seem to be opinions and therefore "cannot be the subject" of a defamation

claim, *see id.,* let alone a violation of her civil rights actionable under section 1983.

Pynn also does not say who made the allegedly defamatory statements about her, and

her defamation claim fails for that reason as well.

What is more, defamation alone is neither a violation of civil rights laws nor

sufficient to give rise to a constitutional claim.  Indeed, "reputation alone, apart from

some more tangible interests such as employment, is [n]either 'liberty' [n]or 'property' by

itself sufficient to invoke the procedural protection of the Due Process Clause."  *Paul v.

Davis*, 424 U.S. 693, 701 (1976).  Therefore, a plaintiff must allege something in

addition to reputational stigma to state a cognizable defamation claim under section

1983.  *Easton v. Sundram*, 947 F.2d 1011, 1016 (2d Cir. 1991), *cert. denied*, 504 U.S.

911 (1992), *abrogated on other grounds*, *Washington v. County of Rockland*, 373 F.3d

310 (2d Cir. 2004).  More specifically, "[t]o establish the so-called 'stigma plus,' a

plaintiff must allege two elements: (1) 'the utterance of a statement sufficiently

derogatory to injure his or her reputation, that is capable of being proved false, and that

he or she claims is false,' plus (2) 'a material state-imposed burden or state-imposed

alteration of the plaintiff's status or rights.'"  *Balentine v. Tremblay*, 554 F. App'x 58, 60

(2d Cir. 2014) (summary order) (quoting *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d

Cir. 2004)).

Pynn's section 1983 defamation claim is subject to dismissal because even if the

defendants' statements amounted to defamation, she has failed to allege the "plus"

necessary to turn her defamation claim into a claim under section 1983.  *See Easton*,

947 F.2d at 1016.  In other words, Pynn has alleged in conclusory terms only that the

statements about her were false and that people at work thought less of her as a result,

24

but more is required for a claim under section 1983. *Balantine*, 554 F. App'x at 61 (finding plaintiff's "alleged reputational damage resulting in the loss of private employment, humiliation, and embarrassment are inadequate to satisfy the 'plus' requirement"). And Pynn's state law defamation claim neither alleges false factual statements as opposed to opinions, nor alleges who made any defamatory statement. Her claims for defamation and under section 1983 based on defamation therefore are subject to dismissal. Again in light of her pro se status, however, she may amend her complaint to state a viable defamation claim that corrects the deficiencies described above.

### 3.    Due Process Right to Care and Custody of Children

Pynn alleges that the defendants also violated her "liberty interest in the care, custody, and management of her children, the right to intimate association, and a substantial measure of sanctuary from unjustified interference from the State." Docket Item 1 ¶ 265.

It is well settled in the Second Circuit "that a parent's interest in the custody of a child is a constitutionally protected liberty interest subject to due process protection." *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 103 (2d Cir. 1999) (quoting *Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir.1992) (alteration omitted)). Parents' rights in this context are both substantive and procedural. *See Hagans v. Nassau Cnty. Dep't of Soc. Servs.*, 2020 WL 1550577, at *5 (E.D.N.Y. Mar. 31, 2020); *see also Albright v. Oliver*, 510 U.S. 266, 272 (1994) (the Due Process Clause "confers both substantive and procedural rights").

25

Essentially, "a procedural due process claim challenges the procedure by which a removal is effected, [while] a substantive due process claim challenges the 'fact of [the] removal' itself." *Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) (alteration in original) (quoting *Bruker v. City of New York*, 92 F. Supp. 2d 257, 266-67 (S.D.N.Y. 2000)). "As a general rule . . . before parents may be deprived of the care, custody or management of their children without their consent, due process—ordinarily a court proceeding resulting in an order permitting removal—must be accorded to them." *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999).

Substantive due process protects parents' right "to remain together [with their children] without the coercive interference of the awesome power of the state.'" *Southerland*, 680 F.3d at 142 (quoting *Tenenbaum*, 193 F.3d at 600). But as sweeping as such language might sound, it is far from absolute. *See Wilkinson*, 182 F.3d at 104 ("Although parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the 'compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.'" (quoting *Manzano v. S.D. Dep't of Soc. Servs.*, 60 F.3d 505, 510 (8th Cir.1995))). Indeed, to constitute a substantive due process violation, "[t]he interference with the" parents' custody of the child "must be 'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'" *Southerland*, 680 F.3d at 152 (quoting *Anthony v. City of New York*, 339 F.3d 129, 142-43 (2d Cir. 2003)).

Stated another way, to state a viable substantive due process claim, "[i]t is not enough that the government act be incorrect or ill-advised; it must be conscience-

shocking." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (citation and internal quotation marks omitted). Indeed, "[o]nly the most egregious official conduct can be said to be arbitrary in th[is] constitutional sense and therefore unconstitutional." *Id.* (citation and internal quotation marks omitted).

Furthermore, "a claim under the Due Process Clause for infringement of the right to familial associations requires the allegation that state action was specifically intended to interfere with the family relationship." *Gorman v. Rensselaer County*, 910 F.3d 40, 48 (2d Cir. 2018). "Common negligence is categorically insufficient to shock the conscience, so [a] parent[] must raise an inference that [the defendants] acted maliciously before [an allegation] can even begin to support a violation of substantive due process." *Cox*, 654 F.3d at 276. Courts impose liability only for "'obvious extremes,' such as manufacturing evidence or ignoring exculpatory information." *E.D. ex rel. V.D. v. Tuffarelli*, 692 F. Supp. 2d 347, 359 (S.D.N.Y. 2010) (quoting *Wilkinson*, 182 F.3d at 104).

Pynn does not allege any specific process that she was denied before her children were removed from her custody. On the contrary, it appears that her children were removed from her custody pursuant to divorce and custody proceedings. *See* Docket Item 1 ¶¶ 110, 119; *see generally* Docket Item 1 at 101-120 (state court docket attached as an exhibit showing court orders regarding custody). So Pynn therefore raises only a substantive due process claim: She says that the defendants "willfully ignor[ed] child abuse," "fail[ed] to investigate reports of severe child abuse," "delay[ed] for seven years a multiphasic forensic evaluation for the children's reports of sexual

27

abuse and strangulation," and corrupted the divorce and custody proceedings.  *Id.* ¶ 265.

Although Pynn generally alleges that all defendants violated her right to substantive due process, she does not include any specific factual allegations that might plausibly implicate most of the defendants for their role in violating her rights.  *See id.*  In fact, most of her allegations are conclusory, claiming that all defendants together "corruptly conspired to deprive [or] harshly restrict . . . Pynn of her Fourteenth Amendment Right of Intimate Association with her children."  *Id.*  That allegation is not detailed enough to plausibly implicate any single defendant.  There are, however, three exceptions: David Nathanson, John Spero, and Niagara County.

### a.      Nathanson

Pynn makes several allegations concerning the role that forensic psychologist David Nathanson played in violating her rights.  *Id.* ¶ 65.  New York State Supreme Court Justice Kloch appointed Nathanson to draft a "forensic custodial evaluation," Pynn says, presumably about Matthew Pynn's fitness to have custody of the children.  *Id.* ¶ 139.   Pynn alleges that "Nathanson conspired to conceal . . . child sexual abuse" by contacting "Niagara [County] CPS and the New York State Police [and] 'requesting' [that] they do not talk to [Pynn's] children about their sexual abuse allegations."  *Id.* ¶¶ 140-41.  She says that he also intentionally failed to include "pertinent" mental health information about Matthew Pynn in his report.  *Id.* ¶¶ 142-43.

Alleging interference with an investigation, suppression of evidence from a court ordered report, and concealment of child abuse certainly are analogous to the "obvious extremes" that courts have found may implicate liability for substantive due process violations.  *See Tuffarelli*, 692 F. Supp. 2d at 359.  And Pynn contends that Nathanson

28

did this with the intent to interfere with her familial relationships and to cover up Matthew Pynn's abuse.  Docket Item 1 ¶¶ 142-43. Therefore, the facts are sufficient to state a plausible substantive due process claim.

But Pynn fails to allege that Nathanson acted under color of state law.  As discussed above, to state a viable section 1983 claim, a plaintiff must plead both the violation of a constitutional right and that the violation "was attributable to a person acting under color of state law."  *Whalen*, 126 F.3d at 405.  The "definition of acting under color of state law requires that the defendant in a [section] 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

The Second Circuit has "identified three 'main tests' to determine" whether an entity or individual, such as Nathanson, has engaged in state action:

> (1) whe[ther] the entity acts pursuant to the coercive power of the state or is controlled by the state ('the compulsion test'); (2) whe[ther] the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ('the joint action test' or 'close nexus test'); and (3) whe[ther] the entity has been delegated a public function by the state ('the public function test').

*See Barrows v. Becerra*, 24 F.4th 116, 135 (2d Cir. 2022) (alterations omitted) (quoting *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)).  "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state."  *Fabrikant*, 691 F.3d at 207 (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)).  And "merely conclusory allegation[s] that a private entity acted in concert with a state actor do[] not suffice to state a [section] 1983 claim against the private

29

entity." *Alicea v. Yang*, 2023 WL 5994211, at *2 (2d Cir. Sep. 15, 2023) (summary order) (citation omitted).  Nor do allegations of "communications between a private and state actor. . . without facts supporting a concerted effort or plan between the parties." *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 338 (E.D.N.Y. 2010), *aff'd*, 417 F. App'x 96 (2d Cir. 2011) (summary order) (alterations and citation omitted).

Pynn alleges that Nathanson is a "purported forensic psychologist" who was appointed by Justice Kloch to complete a "forensic custodial evaluation" on Matthew Pynn.  Docket Item 1 ¶¶ 65, 139.  But there is no indication that Nathan was employed by the state or was otherwise a state actor.  And other than her conclusory allegations that all defendants "conspired" in this case, Pynn does not allege that Nathanson made a "concerted effort or plan" with the state to interfere in the investigation or to suppress evidence relevant to the report.  So the fact that Nathanson was appointed by the court and submitted a report is not enough to make him a state actor.  *See Walker v. O'Connor*, 2022 WL 2341420, at *3 (N.D.N.Y. Jun. 29, 2022) (collecting cases) (the "allegation that [the psychologist] was ordered by the court to issue a forensic evaluation does not give rise to the reasonable inference that she was acting under color of state law").

In sum, Pynn has pleaded facts that create a plausible substantive due process violation, but she has not sufficiently pleaded that Nathanson acted under color of state law.  Because of her pro se status, however, Pynn may file an amended complaint detailing the manner in which Nathanson acted under color of state law.

> b.    Spero

Pynn alleges that New York State Police Officer Spero "created an unsworn letter on police letterhead . . . containing knowing and willful false statements that he did an

investigation and [that] there was no indication 'that [Matthew] Pynn ever acted in a manner that would be considered harmful to the welfare of his child.'"  Docket Item 1 ¶ 146.  Similar to the allegations against Nathanson, these allegations involve accusations of "manufacturing evidence," which can implicate a substantive due process violation of the right to familial association.  *See Tuffarelli,* 692 F. Supp. 2d at 359.  Therefore, Pynn has pleaded facts sufficient to state a plausible due process claim against Spero in his individual capacity.

### c.    Niagara County

To plead a viable section 1983 claim against a municipality, "a plaintiff must allege the existence of a formal policy which is officially endorsed by the municipality, or a practice so persistent and widespread that it constitutes a custom or usage of which supervisory authorities must have been aware, or that a municipal custom, policy, or usage can be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Iacovangelo v. Corr. Med. Care, Inc.,* 624 F. App'x 10, 13 (2d Cir. 2015) (summary order).  "Absent an express municipal policy, [a] plaintiff may prove a municipal custom, policy[,] or practice in several ways." *Ramos v. County of Suffolk,* 2009 WL 10708571, at *2 (E.D.N.Y. Sep. 8, 2009).  One way is to demonstrate a policymaker's "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." *Jeffes v. Barnes,* 208 F.3d 49, 61 (2d Cir. 2000) (citation omitted).  "In limited circumstances, a municipality may also be held liable for its failure to train," supervise, discipline, or screen its employees.  *See Hernandez v. United States,* 939 F.3d 191, 206 (2d Cir. 2019) (citation and internal quotation marks omitted); *Tirado v. City of New York,* 2021 WL 11646299, at *9 (S.D.N.Y. Jan. 25, 2021).

31

But "[w]here plaintiffs seek to hold a municipality liable under" those theories, "they must also show that the municipal policymaker acted with deliberate indifference." *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014) (citing *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989)); *see Tirado*, 2021 WL 11646299, at *9 (explaining that "[m]unicipal liability can also be established through a municipal policymaker's failure to appropriately train, supervise, discipline, or screen municipal employees where such a failure amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact" (citation and internal quotation marks omitted)). "Deliberate indifference is a stringent standard of fault," so a plaintiff must plausibly allege that the municipality "fail[ed] to act when it ha[d] 'actual or constructive notice.'" *Hernandez*, 939 F.3d at 207 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). Stated differently, a plaintiff must allege "that the municipal action was taken with deliberate indifference as to its known or obvious consequences. A[n] allegation] of simple or even heightened negligence will not suffice." *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) (alterations and citation omitted).

Pynn alleges that Niagara County engaged in "reprehensible hiring practices," including the intentional "hiring of multiple disgraced criminal public officials." Docket Item 1 ¶¶ 73-74. She specifically points to the hiring of Matthew Pynn, who she says had a known history of child sexual abuse, and Nicholas D'Angelo—a former attorney for Niagara County DSS and CPS—who she says was a "known sex offender" when he was hired. *Id.* ¶¶ 60, 74, 95, 253. Liberally reading these allegations, the Court construes them as claiming that Niagara County failed to screen its employees, resulting in the violation of Pynn's substantive due process rights.

32

To establish a failure-to-screen claim, "a plaintiff must plead facts to support an inference that the municipality's hiring of the individual reflected 'deliberate indifference to the risk that a violation of a particular constitutional or statutory right [would] follow the decision.'" *Tirado*, 2021 WL 11646299, at *12 (alteration in original) (quoting *Lehal v. Cent. Falls Det. Facility Corp.*, 2016 WL 7377238, at *8 (S.D.N.Y. Nov. 21, 2016)). The plaintiff must do "more than cursorily state a theory of liability based on the [municipality's] failure to screen." *Id.*

The complaint here passes muster, at least at this stage. Pynn alleges that Niagara County's practice of hiring employees who are known "child sexual perpetrator[s]" constitutes deliberate indifference to the risk that those employees may "conspire[] to commit and cover up . . . child sexual abuse," "den[y] a fair forum for court and [c]hild [p]rotection investigations," and "willfully ignore[] evidence" and reports of child abuse. Docket Item 1 ¶ 253. And those are the exact actions that Pynn now says have resulted in her injury. *Id.*; *see also id.* ¶¶ 258, 260. At this stage, Pynn's allegations present a sufficiently plausible claim for failure to screen.

### d.     Conclusion

Pynn's fourth cause of action for violation of due process related to the care and custody of her children therefore may proceed against Niagara County and Spero in his individual capacity. Her similar claims against the remaining defendants are subject to dismissal. But in light of Pynn's pro se status, *Cuoco*, 222 F.3d at 112, she may amend her complaint to detail the specific role that any of the other defendants played in the violation of her right to the care and custody of her children and the manner in which Nathanson acted under color of state law.

33

### B.      18 U.S.C. § 1591

Pynn's sixth cause of action alleges that the defendants engaged in a

"conspiracy to sex traffic minors in violation of 18 U.S.C. § 1591."  Docket Item 1 at 89.

Section 1591 was enacted through the Trafficking Victims Protection Act ("TVPA"),

*Cornish v. Tripp*, 2026 WL 194596, at *1, 3 (D. Conn. Jan. 26, 2026), and establishes

criminal penalties for "knowingly . . . recruit[ing], entic[ing], . . . or solicit[ing]" someone to

engage in a commercial sex act and using "force, threats of force, fraud, [or] coercion"

to accomplish that purpose, 18 U.S.C. § 1591(a).  It also "imposes criminal liability upon

whoever knowingly . . . 'recruits, entices, harbors, transports, provides, obtains,

advertises, maintains, patronizes, or solicits by any means a person,'" *Kitler v. Church*

*of Jesus Christ of Latter-Day Saints*, 2025 WL 2209870, at *9 (N.D.N.Y. Aug. 4, 2025)

(quoting 18 U.S.C. § 1591(a)(1)), or "'benefits, financially or by receiving anything of

value, from participation in a venture which has engaged in an act [described in section

1591(a)(1)],' with knowledge, or a reckless disregard for the fact, 'that the person has

not attained the age of 18 years and will be caused to engage in a commercial sex act,'"

*see id.* (quoting 18 U.S.C. § 1591(a)(2)).  In other words, section 1591 "bars" either "sex

trafficking of children or by force, fraud, or coercion."  *Cornish*, 2026 WL 194596, at *3.

Although section 1591 does not include a civil remedy, a subsequent section of

the statute—18 U.S.C. § 1595—"provides for a private right of action in favor of any

victim of a violation" of section 1591.  *See Moore v. Rubin*, 724 F. Supp. 3d 93, 99

(E.D.N.Y. 2024); *see also Ardolf v. Weber*, 332 F.R.D. 467, 473 (S.D.N.Y. 2019).  More

specifically, section 1595 states that an "individual who is a victim of a violation of this

chapter may bring a civil action against the perpetrator (or whoever knowingly benefits,

or attempts or conspires to benefit, financially . . . from participation in a venture which

34

[it] knew or should have known has engaged in an act in violation of this chapter).” 18 U.S.C. § 1595(a).  This Court therefore generously construes Pynn's claim as a request for relief under section 1595 based on an underlying violation of section 1591.

Pynn has not raised a viable claim, however, for at least two reasons.  First, section 1595 permits only victims to bring a civil action, and Pynn does not allege that she is a victim of sex trafficking.[12]  *See* 18 U.S.C. § 1595 (“[A] victim of a violation of this chapter may bring a civil action[.]”); *see also Cornish*, 2026 WL 194596, at *3 (section 1595 “does not permit individuals who are not the victim . . . to bring a claim on behalf of a victim”).  Second, even if that were not the case, a claim made under section 1595's civil remedy provision “must allege that the defendant[s] 'knowingly benefit[ted], financially or by receiving anything of value,' from participating in a trafficking venture.” *Smith v. Ebanks*, 2024 WL 1242082, at *3 (E.D.N.Y. Mar. 22, 2024) (quoting 18 U.S.C. § 1595(a)).  And Pynn does not allege that the defendants financially benefitted from commercial sex trafficking; instead, she alleges only that they “had to have known” about Matthew Pynn's abuse and “conspired to criminally commit and cover up” such abuse.[13]  Docket Item 1 ¶¶ 267-69.

---

[12] Moreover, because Pynn is proceeding pro se, she cannot assert that claim on behalf of her children.  *See Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005) (“It is . . . a well-established general rule in this Circuit that a parent not admitted to the bar cannot bring an action pro se in federal court on behalf of his or her child.” (italics omitted)).

[13] Pynn alleges that the defendants had a “financial motive to conceal the child abuse,” Docket Item 1 ¶ 245, but she does not say that they financially benefitted from any alleged sex trafficking.

Because Pynn has not raised a viable claim under 18 U.S.C. § 1595, and because better pleading cannot cure that deficiency, Pynn's sixth cause of action is dismissed without leave to amend.

### C.    RICO

"To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of [s]ection 1962." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001)). To show a violation of section 1962, a plaintiff must "allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (quoting 18 U.S.C. § 1962(a)-(c)). "And to state a RICO conspiracy" claim under section 1962(d), "a plaintiff must allege 'the existence of an agreement to violate RICO's substantive provisions.'" *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018) (quoting *United States v. Sessa*, 125 F.3d 68, 71 (2d Cir. 1997)).

"A plaintiff's burden is high when pleading RICO allegations." *Mackin v. Auberger*, 59 F. Supp. 3d 528, 541 (W.D.N.Y. 2014). "[G]iven RICO's damaging effects on the reputations of individuals alleged to be engaged in RICO enterprises and conspiracies," courts "look with particular scrutiny at [civil RICO] claims." *Id.* (citations and internal quotation marks omitted); *see also Katzman v. Victoria's Secret Catalogue*,

36

167 F.R.D. 649, 655 (S.D.N.Y. 1996) ("Because the 'mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" (alterations omitted) (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir.1990))); *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, 2013 WL 3943267, at *5 (S.D.N.Y. July 31, 2013) (observing that "frivolous RICO allegations are often manifested in the form of 'garden variety fraud or breach of contract cases that some [p]laintiff has attempted to transform into a vehicle for treble damages by resort to what has been referred to as the litigation equivalent of a thermonuclear device'" (alterations and some internal quotation marks omitted) (quoting *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 394 (S.D.N.Y. 2000))).

Pynn has failed to state a plausible RICO claim for at least three reasons.  First, she has not sufficiently pleaded the existence of an "enterprise."  Second, she has not pleaded any effect on "foreign or interstate commerce."  Third, she has not sufficiently pleaded a conspiracy.

### 1.    Existence of an Enterprise

"A RICO enterprise 'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'"  *DeFalco*, 244 F.3d at 306 (quoting 18 U.S.C. § 1961(4)).  "A racketeering enterprise is proven through 'evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'"  *Id.* at 307 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  "Thus,

evidence of an ongoing organization, the associates of which function as a continuing unit, suffices to prove an enterprise." *Id.* (citing *Turkette*, 452 U.S. at 583)).

"[A] governmental unit can be a RICO enterprise." *Id.* at 307-08 (citing *United States v. Angelilli*, 660 F.2d 23, 30-35 (2d Cir. 1981)). But "[i]t is well established . . . that, under [section] 1962(c), the alleged RICO 'person' and RICO 'enterprise' must be distinct." *Id.* (citation omitted). As the Supreme Court has explained, "[t]he 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages," and "[t]he existence of an enterprise at all times remains a separate element" of a RICO claim. *Turkette*, 452 U.S. at 583. "Accordingly, 'in assessing whether an alleged enterprise has an ascertainable structure distinct from that inherent in a pattern of racketeering, it is appropriate to consider whether the enterprise would still exist were the predicate acts removed from the equation.'" *Mackin*, 59 F. Supp. 3d at 544 (quoting *Wood v. Inc. Vill. of Patchogue*, 311 F. Supp. 2d 344, 357 (E.D.N.Y. 2004) (alteration omitted)).

Pynn alleges the existence of a single enterprise, and she says that all defendants "are in some way []related to or are members of" that enterprise. Docket Item 7 at 156. But the alleged enterprise is not "distinct" from the alleged RICO activities and therefore is not an enterprise at all. *Turkette*, 452 U.S. at 583. In fact, Pynn explicitly says that the sole purpose of the enterprise is for Matthew Pynn and his co-defendants to conspire to commit "illegal abduction, through court ordered removal of custody from safe custodial parents, through false, manufactured, premises, and other means . . . and [to] actually remove[] and 'kidnap[]' minor children for the purposes of engaging . . . in abusive sex acts[,] . . . molestation[,] and abuse." *See*

38

Docket Item 7 at 142.  In other words, the enterprise exists for the defendants to "conspire[,] . . . actually commit[,] and cover[] up the hiring of multiple disgraced criminal public officials" and for "Matthew Pynn's child sexual abuse, strangulation and other . . . forms of child abuse."  *Id.* at 157.  So the enterprise is no different than the alleged illegal acts.

Therefore, the alleged enterprise "would [not] still exist were the predicate acts removed from the equation."  *Mackin*, 59 F. Supp. 3d at 544 (quoting *Wood*, 311 F. Supp. 2d at 357); *see Newkirk v. Village of Steger*, 2004 WL 2191589, at *16 (N.D. Ill. Sept. 24, 2004) (explaining that plaintiffs failed to allege existence of an enterprise where "asserted 'purpose' [wa]s nothing more than a laundry list of the alleged predicate acts . . . [and p]laintiffs offer[ed] nothing to show that [d]efendants ever functioned as an ongoing RICO organization or had any goals separate from the alleged predicate acts").  And for that reason, Pynn has failed to plead the existence of a RICO enterprise.[14]

### 2.    Affecting Foreign or Interstate Commerce

To state a RICO claim, the complaint must "allege[] that the enterprise engaged in, or that its activities affected, interstate or foreign commerce."  *Edmondson v. Raniere*, 751 F. Supp. 3d 136, 160 (E.D.N.Y. 2024).  That burden is not high:

---

[14] Pynn points to other unrelated instances of wrongdoing by some defendants to support the existence of an enterprise—for example, past allegations of harassment against Puleo and Jastrzemski, Docket Item 7 at 160, 162, and Isenberg's prior arrest. *id.* at 160.  She also asserts a history of "nepotism" in Niagara County.  *Id.* at 163-64. But Pynn does not explain how these allegations are tied to the supposed enterprise or how such facts indicate the existence of an "ongoing organization" between the defendants.  *See DeFalco*, 244 F.3d at 307.

"'[C]onduct having even a de minimis effect on interstate commerce suffices' to satisfy this element." *Id.* (alteration in original) (italics omitted) (quoting *United States v. Mejia*, 545 F.3d 179, 203 (2d Cir. 2008)); *see also United States v. Barton*, 647 F.2d 224, 233 (2d Cir. 1981) ("[T]o establish a violation of [section] 1962, the courts have ruled that the impact need not be great.  So long as the activities of the enterprise affect interstate commerce, the jurisdictional element is satisfied.").  At the same time, this requirement is not meaningless, and a plaintiff must plead some facts showing an impact on interstate or foreign commerce to state a RICO claim.  *See Edmondson*, 751 F. Supp. 3d at 181 n.29 ("Although the burden to plead this element is minimal, the complaint still must offer sufficient facts to meet that burden." (citation and internal quotation marks omitted)).

Pynn says that the enterprise impacted interstate commerce by "defrauding" the "United States of Title IV funding through false pretenses, and the trafficking of child sex abuse victims" and by "suppl[ying] an unlimited number of child victims to pedophiles throughout the state for profits."  Docket Item 7 at 166.  She also alleges that the defendants have "defraud[ed] the United States of []millions of dollars each year."  *Id.*  But those are nothing more than conclusions about the impact on interstate commerce, not facts that might support those conclusions.  And that is not enough to state a viable RICO claim.  *See Lally v. Leff*, 2018 WL 4445152, at *5 (E.D.N.Y. Sep. 18, 2018) (holding that because "[t]he allegations on which plaintiff relie[d] . . . contain[ed] only vague and conclusory assertions regarding . . . interstate commerce," they were "insufficient to meet even the low pleading threshold"); *Rubinov v. Suyunova*, 2025 WL 461353, at *2 (E.D.N.Y. Feb. 11, 2025) (holding that "plaintiff's conclusory allegation

40

that defendants' actions affected interstate commerce because defendants either supported or transmitted, 'via interstate commerce[,] . . .' threats and intimidation towards plaintiff [wa]s not sufficient to establish the 'affect interstate commerce' prong of a RICO claim").

### 3.    RICO Conspiracy

"[T]he core of a RICO civil conspiracy is an agreement to commit predicate acts." *Edmondson*, 751 F. Supp. 3d at 176 (quoting *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990)).  To show this, the plaintiff must plead that "each defendant 'knew about and agreed to facilitate' the pattern of racketeering activity."  *Id.* (quoting *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003)).  Pynn alleges that the defendants "all conspired and actually committed and covered up the hiring of multiple disgraced criminal public officials," including Matthew Pynn.  Docket Item 7 at 157.  But once again, Pynn's assertions are conclusory and devoid of any facts showing an "agreement" between and among the defendants to engage in a "pattern of racketeering activity."  *See Edmondson*, 751 F. Supp. 3d at 176.

### 4.    Conclusion

For all those reasons, Pynn has failed to plead a viable RICO claim.  Indeed, Pynn's "allegations as to these claims are conclusory, without factual support, and suggest that [she] is merely dissatisfied with" actions by certain government officials, including the courts, and the outcomes of the proceedings in which she was involved. *See Masri v. Liebowitz*, 2024 WL 1639904, at *8 (S.D.N.Y. Apr. 15, 2024), *appeal dismissed sub nom., Masri v. Afriyie*, 2025 WL 1603359 (2d Cir. Feb. 24, 2025); *see also Mackin*, 59 F. Supp. 3d at 546 (dismissing RICO claim where plaintiff "simply

41

attempt[s] to craft a claim under RICO based upon purely personal disputes." (quoting *Daskal v. Tyrnauer*, 37 Misc.3d 1214(A), at \*38, 2012 WL 5276925 (Sup. Ct. Kings Cnty. 2012))).  That is not sufficient, particularly in light of the high pleading standards that apply to RICO claims.  *See Mackin*, 59 F. Supp. 3d at 541.

Nevertheless, in light of Pynn's pro se status, she may amend her complaint to allege facts establishing a RICO claim.  In any amended complaint, Pynn must specifically allege facts establishing 1) an enterprise that is distinct from the alleged conspiracy and its goals, 2) activities affecting interstate commerce, and 3) an agreement between and among the defendants to accomplish the unlawful purpose.

## V.    MOTION TO AMEND

Pynn's motion to amend seeks to add five new defendants to the action: George Maziarz, a former New York state senator to whom Matthew Pynn has donated money; Beverly Maziarz, George Maziarz's wife and a friend of Matthew Pynn; Michele Bergeven, an attorney who represented Matthew Pynn; Patrick Balkin, an attorney for the Niagara County DSS and Matthew Pynn; and Catherine Wojtaszek, the former Niagara County District Attorney.  Docket Item 25 ¶ 12.

Federal Rule of Civil Procedure 15(a)(2) provides that a "court should freely give leave [to amend] when justice so requires."  This "permissive standard . . . is consistent with [the Second Circuit's] strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3. Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (citation and internal quotation marks omitted).  The decision "to grant or deny leave to amend" is nevertheless committed to "the sound discretion of the district court." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  "A district court

has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Id.* "[T]he standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss." *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015).

Pynn's proposed amended complaint alleges that the new defendants collectively engaged in mail fraud, wire fraud, obstruction of justice, extortion, and money laundering; violated the False Claims Act; violated her civil rights as alleged in the original complaint; and were involved in the conspiracy described in the original complaint. Docket Item 25 ¶¶ 34-47, 51-56. But she does not plead any facts showing what any of the new defendants did to injure her. On the contrary, she pleads conclusions, not facts.

For example, Pynn says that George Maziarz, a former state senator, is a "primary influence in judicial assignments" and uses his "influence to determine case outcomes, contracts, and retaliatory legal actions." *Id.* ¶ 12. George's wife, Beverly Maziarz, also "influence[s] judicial assignments and case outcomes." *Id.* ¶ 33. And together, the couple uses campaign funds to "protect . . . individuals convicted of sexual offenses." *Id.* But those are conclusions, not facts. And at least as pleaded, they have nothing to do with Pynn's case.

Along the same lines, Pynn says that Wojtaszek "shielded . . . Matthew Pynn from prosecution and is related to Defendant [Justice] Kloch." *Id.* ¶ 12. Similarly, Pynn alleges that Bergevin and Balkin, both attorneys for Matthew Pynn, submitted false information to the court and "prosecuted duplicative and retaliatory matters." *Id.* ¶¶ 12,

43

25, 29.  But none of those allegations show how any proposed new defendant engaged in fraud or any other nefarious activity or how anything they did affected Pynn's rights. Pynn's motion to amend therefore is denied as futile.

If Pynn seeks to add any new defendant in any subsequent amended complaint, she must plead facts, not conclusions, about what each defendant did or did not do that resulted in an injury to her.  And as explained above, any amended complaint must include all allegations against each of the defendants so that the amended complaint stands alone as the only complaint that the defendants must answer.  *See supra* note 1; *Int'l Controls Corp.*, 556 F.2d at 668.

## VI.    MOTION FOR PRELIMINARY INJUNCTION

For the second time, Pynn has moved for a preliminary injunction.  Docket Item 29.  "A plaintiff seeking a preliminary injunction must establish that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in h[er] favor, and that an injunction is in the public interest."  *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490, 499 (S.D.N.Y. 2022) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)).  "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*, 555 U.S. at 24.

Pynn's first motion for a preliminary injunction "enforcing [her] First Amendment right of unrestricted access to New York State . . . courts" sought to enjoin Niagara County and Niagara County CPS "from maintaining [court] cases involving [Pynn] and her immediate family."  Docket Item 4 at 1-2, 30.  She asked the Court to order that all such proceedings be transferred to another state court or to federal court.  *Id.* at 2.  The Court denied Pynn's motion, and her subsequent motion for reconsideration, explaining

44

that under *Younger v. Harris*, 401 U.S. 37 (1971), and domestic relations abstention, and under the *Rooker-Feldman* doctrine, federal courts generally do not have any power to intervene in or overturn state court decisions—especially in cases that involve matrimonial issues such as child custody.  Docket Item 9 (denying motion for preliminary injunction); Docket Item 14 (denying motion for reconsideration).

Pynn's second motion for a preliminary injunction seeks a variety of related relief. For example, she asks this Court to (1) enjoin the defendants from "[d]eleting, backdating, altering, or withholding any docket entries, NYSCEF filings, paper submissions, recusal forms, transfer orders, or administrative correspondence" in seven different state court matters in which Pynn is a party; (2) enjoin the defendants from refusing to file submissions based on Justice Sedita's filing restriction against her; (3) enjoin the defendants from "[i]mposing any sanction, fee or other penalty" against her for seeking court records; (4) direct the "[c]ourt [a]dministration [d]efendants" to provide Pynn with "copies of the NYSCEF dockets and all 'processed' entries" in each of her seven cases; (5) direct the "[c]ourt [a]dministration [d]efendants" to "[p]reserve in unaltered form all recusal logs, transfer requests, administrative orders, and correspondence relating to judicial assignments, disqualifications, and venue determinations" in Pynn's cases, and to make those records available to her; (6) enjoin the defendants from "[t]aking any adverse action" against Pynn in response to her filing this action; (7) enjoin US Bank Trust National Association[15] and Niagara County from

---

[15] Despite Pynn's claim that US Bank is a defendant in this matter, *see* Docket Item 29 at 3, it is not mentioned in either her original complaint or her proposed amended complaint.  Moreover, it is unclear how the foreclosure proceeding has any bearing on the facts of this case.

45

"[t]aking any further steps to enforce the foreclosure judgment" on her home; and (8) direct itself to expedite screening Pynn's complaint.  Docket Item 29 at 1-3.

Except for the final request, which is denied as moot in light of this screening order, the requested relief relates to the administration of ongoing civil actions in, and orders issued by, state courts.  And as this Court already explained when it denied Pynn's first motion for a preliminary injunction, the Court cannot "intervene in 'civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions.'"  Docket Item 9 at 15 (quoting *Falco*, 805 F.3d at 427).

In *Younger*, the Supreme Court endorsed "a strong federal policy against federal[ ]court interference with pending state judicial proceedings absent extraordinary circumstances."  *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982).  Pynn's latest motion for injunctive relief refers to seven state court proceedings without saying what those proceedings involve or whether they still are pending, so this Court does not address whether the injunction she requests is technically barred under *Younger*.  But "a [c]ourt may abstain" from granting injunctive relief "under the principles of comity and federalism," even if all the requirements of *Younger* are not met, "when . . . 'the equitable relief sought would inappropriately require the federal court to supervise institutions central to the state's sovereignty.'" *Kunz v. N.Y. State Comm'n on Jud. Conduct*, 356 F. Supp. 2d 188, 194 (N.D.N.Y. Feb. 15, 2005) (quoting *Miller v. Silbermann*, 951 F. Supp. 485, 491-92 (S.D.N.Y. 1997)).

That is precisely the kind of relief that Pynn seeks here: a sprawling injunction that would require this Court to engage in "an ongoing federal audit" of Pynn's interactions with state and local officials, courts, and other entities.  *See O'Shea v.*

46

*Littleton,* 414 U.S. 488, 500 (1974).  What is more, the injunctive relief Pynn seeks against the defendants is both unwise and unworkable.

So this Court does not have the power to do what Pynn asks it to do.  And even if it did have that power, it would not intervene in matters being handled by the state courts.[16]  The Court therefore denies Pynn's motion for a preliminary injunction.

## CONCLUSION

For the reasons stated above, Pynn's claim for violation of the right to care and custody of her children may proceed against Niagara County and Spero in his individual capacity.  But her claims against the judicial defendants, Isenberg, Puleo, the New York State Unified Court System, the New York State Office of Court Administration, the Niagara County Clerk's Office, Niagara County DSS, and Niagara County CPS are dismissed under 28 U.S.C. § 1915(e)(2)(B).  And her other claims against the remaining defendants will be dismissed under that same section unless, within 45 days of the date of this order, she files an amended complaint that corrects the deficiencies noted above and otherwise complies with Rules 8 and 10 of the Federal Rules of Civil Procedure.

---

[16] The injunctive relief Pynn requests in her complaint, Docket Item 1 at 97-99, asks for the same type of relief requested in her second motion for a preliminary injunction: for this Court to essentially oversee Pynn's interactions with local courts and officials.  *See, e.g., id.* at 98 (requesting that this Court order the defendants "to cease and desist from obstructing official government records, including but not limited to documents from court and corresponding docket sheets").  Those requests are denied for the same reasons just discussed in connection with the motion for a preliminary injunction.

47

Pynn's requests for declaratory and injunctive relief, Docket Item 1 at 97-99; her motion to amend, Docket Item 24; and her motion for a preliminary injunction, Docket Item 29, are DENIED.

Pynn is reminded that an amended complaint is intended to **completely replace** the prior complaint in the action and thus "renders [any prior complaint] of no legal effect." *Int'l Controls Corp.*, 556 F.2d at 668; *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Therefore, any amended complaint **must include all allegations against each of the defendants** so that the amended complaint stands alone as the only complaint that the defendants must answer in this action.

## ORDER

In light of the above, IT IS HEREBY

ORDERED that Pynn's claim for violation of the right to care and custody of her children against Niagara County and Spero in his individual capacity may proceed to service; and it is further

ORDERED that Pynn's claims against Norman St. George, Lawrence Marks, Kevin Carter, Keith D. Kibler, Daniel J. Furlong, Richard Kloch, Frank Sedita, Sara Sheldon, Catherine Nugent Panepinto, Andrew Isenberg, Dean Puleo, the New York State Unified Court System, the New York State Office of Court Administration, the Niagara County Clerk's Office, the Niagara County Department of Social Services, and Niagara County Child Protective Servies are dismissed, and the Clerk of the Court shall terminate those parties as defendants in this action; and it is further

ORDERED that Pynn may amend her complaint within 45 days of the date of this order; and it is further

48

ORDERED that the Clerk of the Court shall send to Pynn with this order a copy of the original complaint, a blank section 1983 complaint form, and the instructions for preparing an amended complaint; and it is further

ORDERED that if Pynn does not file an amended complaint correcting the deficiencies noted above within 45 days of the date of this order, her claims against all defendants other than Niagara County and Spero will be dismissed; and it is further

ORDERED that if Pynn does not file an amended complaint within 45 days of the date of this order, the Clerk of the Court shall cause the United States Marshals Service to serve copies of the summons, the complaint, and this decision and order upon Niagara County and Spero, without her payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in Pynn's favor;[17] and it is further

ORDERED that Pynn must effect service within 90 days of the date the summons is issued.  It is Pynn's responsibility to inquire of the Marshals at 716-348-5300 as to whether service has been made and, if necessary, to request an extension of time for service.  *See Meilleur v. Strong*, 682 F.3d 56, 63 (2d Cir. 2012).  If, within 90 days of issuance of the summons, Pynn has not made service or requested an extension of time in which to do so, the Court may dismiss this action for failure to prosecute under Rules 4(m) and 41(b) of the Federal Rules of Civil Procedure; and it is further

ORDERED that Pynn shall notify the Court in writing if her address changes. The Court may dismiss the action if Pynn fails to do so.

---

[17] If Pynn files an amended complaint as provided in this decision and order, service will be deferred until the Court has screened the amended complaint.

49

SO ORDERED.

Dated:    July 24, 2026
          Buffalo, New York


                                        /s/ Lawrence J. Vilardo
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE